1  RANDOLPH L. HOWARD, ESQ.
   Nevada Bar No. 006688
2  SHLOMO S. SHERMAN, ESQ.
   Nevada Bar No. 009688
3  **KOLESAR & LEATHAM**
   400 South Rampart Boulevard, Suite 400
4  Las Vegas, Nevada  89145
   Telephone:  (702) 362-7800
5  Facsimile:  (702) 362-9472
   E-Mail:     rhoward@klnevada.com
6              ssherman@klnevada.com

7  Attorneys for Plaintiff
   FEDERAL DEPOSIT INSURANCE
8  CORPORATION AS RECEIVER OF
   AMTRUST BANK
9

10

11

12            **UNITED STATES DISTRICT COURT**

13              **DISTRICT OF NEVADA**

14                    * * *

15 FEDERAL DEPOSIT INSURANCE          CASE NO.
   CORPORATION AS RECEIVER OF
16 AMTRUST BANK,

17            Plaintiff,               **COMPLAINT FOR:**

18       vs.                          1.  **BREACH OF CONTRACT;**
                                       2.  **NEGLIGENCE;**
19 NEVADA TITLE COMPANY, a Nevada     3.  **BREACH OF FIDUCIARY**
   corporation; and MARK A. GONZALEZ, an      **DUTY;**
20 individual,                        4.  **BREACH OF CONTRACT –**
                                              **THIRD PARTY BENEFICIARY;**
21            Defendants.                     **AND**
                                       5.  **NEGLIGENT**
22                                            **MISREPRESENTATION**

23
        Plaintiff Federal Deposit Insurance Corporation, as Receiver for AmTrust Bank ("FDIC-
24
   R"), complains against defendants as follows.
25
                    **PARTIES, JURISDICTION AND VENUE**
26
        1.      The Federal Deposit Insurance Corporation ("FDIC") is a corporation organized
27
   and existing under the laws of the United States of America.   Under the Federal Deposit
28

Insurance Act ("FDIA"), the FDIC is authorized to be appointed as receiver for failed insured depository institutions. AmTrust Bank ("AmTrust") was a federally chartered savings bank with its principal place of business in Cleveland, Ohio. On December 4, 2009, AmTrust was closed by the Office of Thrift Supervision and the FDIC was appointed as Receiver pursuant to 12 U.S.C. § 1464(d)(2)(A) and 12 U.S.C. § 1821(c)(5). Under the FDIA, the FDIC as receiver succeeds to all claims held by banks for which it is the receiver. 12 U.S.C. § 1821(d)(2)(A)(i). Plaintiff owns the subject claims and has standing to prosecute this action as Receiver for AmTrust.

2.      Defendant Nevada Title Company ("Nevada Title") is a Nevada corporation, with its principal place of business in Las Vegas, Nevada.

3.      Defendant Mark A. Gonzalez ("Gonzalez") is an individual residing in Las Vegas, Nevada. Gonzalez is a Nevada licensed appraiser (Lic. No. A.0006350-CR).

4.      This Court has subject matter jurisdiction for this action pursuant to 12 U.S.C. § 1811 *et seq*., 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345. Actions to which the FDIC-R is a party are deemed to arise under the laws of the United States. The FDIC, including in its capacity as Receiver, has the authority to sue and complain in any court of law, and is empowered to pursue claims held by the Bank, including its claims against the Defendant. 12 U.S.C. § 1819.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district and the property that is the subject of the action is situated in this district.

## FACTUAL BACKGROUND

6.      AmTrust focused a core portion of its business on mortgage banking.

7.      This action arises out of a builder-bailout scheme. As Freddie Mac describes, in a builder-bailout scheme, a builder who is unable to sell a satisfactory number of units within a newly built residential development will attempt to creatively disguise a sham home sale as a legitimate transaction, often times colluding with real estate appraisers, mortgage loan brokers, and settlement agents in the perpetration of this scheme.

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

8.      A typical transaction within a builder-bailout scheme, including the transactions in this case, involve non-arms-length sales in which the builder-seller will pay excessive commissions to a realtor/broker, and in order to finance these excessive commissions, a straw-buyer is recruited and used to obtain an inflated mortgage loan from an unsuspecting lender who is misled into believing the sales price is higher than it truly is.

9.      This action involves five separate transactions, each of which were closed by Nevada Title and each of which were entered into in connection with a builder-bailout scheme involving Wagner Homes, Inc. ("Wagner").   As shown below, in each transaction, excessive commissions were paid and funded through AmTrust mortgage loans which were obtained through misrepresentation of the true sales price in each transaction.

10.      In order to execute this scheme, Defendant Gonzalez provided inflated appraisals in connection with four of the five transactions, which inflated appraisals were used to obtain inflated mortgage loans from AmTrust.

### *THE STEPHENSON LOAN*

#### *The Loan from AmTrust to Stephenson*

11.      In or about November, 2008, Queen Stephenson ("Stephenson") sought a loan from AmTrust to finance the purported purchase of a home from Wagner (the "Stephenson Transaction").

12.      The real property which was the subject of the purported sale from Wagner to Stephenson was located at 6741 Barrington Hills St., Las Vegas, Nevada 89149 (the "Barrington Property").

13.      Under the Stephenson Transaction, Stephenson agreed to purchase the Barrington Property from Wagner for a purported purchase price of $427,000.

14.      The amount of the loan sought by Stephenson to finance the purchase of the Barrington Property was $405,650 (the "Stephenson Loan").   AmTrust approved the Stephenson Loan on the condition that Stephenson personally pay at least $22,360 as a deposit payment.

/ / /

/ / /

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

15.     AmTrust further imposed a 95 percent loan-to-value ("LTV") ratio cap on the Stephenson Loan, which meant that the amount of the loan in the transaction could not exceed 95 percent of the purchase price.

### The Stephenson Transaction Closing Instructions

16.     In or about October 2008, Nevada Title contracted with AmTrust, agreeing to serve as the closing agent for the Stephenson Transaction and, as such, Nevada Title agreed to abide by AmTrust's Closing Instructions (the "Stephenson Closing Instructions").

17.     The Stephenson Closing Instructions provide that Nevada Title was only authorized to act as directed by the Stephenson Closing Instructions, stating in part:

> In closing this loan, you … must follow the instructions and satisfy the conditions set forth in these Master Closing Instructions, [and] the Supplemental Closing Instructions … all of which, taken together, constitute the closing instructions. Do not proceed unless you are fully prepared to follow these instructions. … Any and all modifications to the Closing Instructions must be in writing and executed by AmTrust Bank. …

> The Closing Agent will be liable for losses incurred by AmTrust Bank as a result of closing a loan with the knowledge that errors were contained in any documents or instructions. If the Closing Agent determines that a loan cannot be closed in accordance with these Closing Instructions, … do not proceed to closing without further instructions from AmTrust Bank. …

18.     The Stephenson Closing Instructions further emphasized strict compliance, providing:

> YOU MUST READ ALL CLOSING INSTRUCTIONS THOROUGHLY PRIOR TO COMMENCING THE CLOSING AND CONTACT [AMTRUST] IMMEDIATELY IF FOR ANY REASON YOU CANNOT COMPLY WITH THEM PRIOR TO THE CLOSING DOCUMENTS EXPIRATION DATE.

19.     As the closing agent for the Stephenson Transaction and as part of its obligations under the Stephenson Closing Instructions, Nevada Title was also responsible for preparing and submitting an accurate HUD-1 Settlement Statement (the "Stephenson HUD-1") to AmTrust. HUD-1 Settlement Statements are statutorily prescribed statements detailing the receipts and disbursements in settlement of a residential real estate transaction. The HUD-1 itemizes all aspects of the closing for the lender, including any payments made by the borrower, money due

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

to the seller, and any fees paid to third parties in connection with the closing.  The closing agent who prepares the HUD-1 must certify that the HUD-1 is a true and accurate account of the transaction and that he caused the funds disbursed in connection with the transaction to be disbursed in accordance with the statement.

20.     Nevada Title accepted the Stephenson Closing Instructions, including all terms and fiduciary duties, by closing the Stephenson Transaction, taking a fee for closing the transaction, and certifying that it closed the transaction in accordance with the Stephenson Closing Instructions.

**Nevada Title's Actions in Closing the Stephenson Transaction**

21.     The Stephenson Closing Instructions emphasized that Nevada Title was to immediately halt closing proceedings and contact AmTrust if it discovered anticipated payoffs other than to clear title, specifically providing the following:

> [Y]ou, as Closing Agent, must halt the closing proceedings (do not fund the loan or file any documents) and immediately call the Closing Contact if you or your employees or agents observe any of the following: ...
>
> • **Disbursements from the closing proceeds other than to clear title**: If funds are to be disbursed for any reason other than (i) to individuals or entities specifically mentioned in the Sales Contract, (ii) to pay off or otherwise insure that Lender has a first and superior deed of trust or mortgage lien . . ., (iii) to pay fees paid to individuals or entities that are customary and or prevalent for standard mortgage lending transactions (iv) to pay off legitimate mechanics or materials lines (sic), tax liens or judgment liens or (v) to pay down or off creditors of the Borrower required to satisfy underwriting conditions. ...

22.     The Stephenson Closing Instructions further required:

> 1.10    If Closing Agent has knowledge that there is, or will be, any secondary financing not set forth in the Supplemental Closing Instructions placed on the property, or that any monies Borrower is required to pay or deposit at closing are not from Borrower's own funds or a bona fide gift, the Closing Agent shall suspend loan closing and immediately notify Lender.
>
> 1.11    Closing Agent is only to accept borrower funds from Borrower's deposit accounts in the financial institutions verified and disclosed on Fannie Mae From 1003, Freddie Mac Form 65, or from the account and institution specified elsewhere in these Closing Instructions.  If Borrower funds come from a different institution or an out-of-state institution, Closing Agent must suspend closing and immediately notify Closing Contact.

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

1.12   All funds must pass through escrow and should be noted on the HUD-1 Settlement Statement. …

1.19   If the real estate commission appears excessive for the market area, Closing Agent must notify [AmTrust Bank] with an explanation. …

1.26   Closing Agent must disburse Seller's Proceeds only to the Seller, its authorized agent or attorney in fact.

23.   Despite these explicit instructions, Nevada Title closed the Stephenson Transaction, even though Nevada Title was aware of excessive real estate commissions being disbursed as part of the transaction; and knew, or should have known, Stephenson had not actually paid the required deposit payments.

24.   Nevada Title did not provide the Stephenson HUD-1 until after the Stephenson Transaction had closed and the Stephenson Loan had funded.

25.   According to the Stephenson HUD-1 prepared by Nevada Title, Stephenson made deposit payments in the total amount of $22,359.92.

26.   The Stephenson HUD-1 also reflected third party commissions payouts in the amount of $93,690 -- $12,560 to Pachinger Realty ("Pachinger") and $81,130 to Realty One Group, Inc. -- a well as another third party payout to Merrill Lynch in the amount of $38,468.

27.   Upon information and belief, Stephenson did not truly pay the deposit payments; Stephenson's deposit payments were paid from a bank other than that designated as Stephenson's banking institution on Stephenson's loan application, and the funds used to obtain Stephenson's deposit payments did not belong to Stephenson.

28.   Upon information and belief, the payment to Merrill Lynch in the Stephenson Transaction was used to fund a portion of the borrower's deposit payment as well as all or a portion of the borrower's first few mortgage payments.

29.   The Stephenson Transaction closed on or around November 3, 2008.

30.   Upon information and belief, Stephenson's purchase price for this transaction was not $427,000, as represented to AmTrust; instead, the true purchase price for the Barrington Property was approximately $165,000.   The purchase price was represented to AmTrust as $427,000 in order to induce AmTrust into providing the borrower a larger mortgage loan.

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

31.     In addition, despite being aware of the excessive commissions payments to Pachinger and Realty One, Nevada Title never informed AmTrust prior to the closing of the transaction and AmTrust's funding of the Stephenson Loan that such excessive commissions payments were to be paid.

32.     Indeed, Nevada Title did not inform AmTrust that Stephenson did not pay her required deposit payments, that Pachinger and Realty One were receiving excessive commissions payments, or that the true purchase price for the Barrington Property was $165,000 (causing the LTV on the Stephenson Transaction to exceed AmTrust's 95 percent cap) prior to the closing of the Stephenson Transaction and AmTrust's funding of the Stephenson Loan.

33.     Nevada Title's breaches of duty in connection with the Stephenson Transaction caused AmTrust to fund a grossly under-secured loan in excess of its LTV requirements, which it otherwise would not have funded had it known the true circumstances surrounding this transaction.

### THE YAVORSKAYA LOAN

#### The Loan from AmTrust to Yavorskaya

34.     In or about November, 2008, Yelena Yavorskaya ("Yavorskaya") sought a loan from AmTrust to finance the purported purchase of a home from Wagner (the "Yavorskaya Transaction").

35.     The real property which was the subject of the purported sale from Wagner to Yavorskaya was located at 3936 Maldive Isle Court, Las Vegas, Nevada 89129 (the "Maldive Property").

36.     Under the Yavorskaya Transaction, Yavorskaya agreed to purchase the Maldive Property from Wagner for a purported purchase price of $449,950.

37.     The amount of the loan sought by Yavorskaya to finance the purchase of the Maldive Property was $417,000 (the "Yavorskaya Loan"). AmTrust approved the Yavorskaya Loan on the condition that Yavorskaya personally pay at least $32,955 as a deposit payment.

///

///

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

38.     AmTrust further imposed a 95 percent LTV ratio cap on the Yavorskaya Loan, which meant that the amount of the loan in the transaction could not exceed 95 percent of the purchase price.

**The Yavorskaya Transaction Closing Instructions**

39.     In or about October 2008, Nevada Title contracted with AmTrust, agreeing to serve as the closing agent for the Yavorskaya Transaction and, as such, Nevada Title agreed to abide by AmTrust's Closing Instructions (the "Yavorskaya Closing Instructions").

40.     The Yavorskaya Closing Instructions contained the exact same provisions as the Stephenson Closing Instructions quoted herein at paragraphs 17 and 18.

41.     As the closing agent for the Yavorskaya Transaction and as part of its obligations under the Yavorskaya Closing Instructions, Nevada Title was also responsible for preparing and submitting an accurate HUD-1 Settlement Statement (the "Yavorskaya HUD-1") to AmTrust.

42.     Nevada Title accepted the Yavorskaya Closing Instructions, including all terms and fiduciary duties, by closing the Yavorskaya Transaction, taking a fee for closing the transaction, and specifically certifying that it closed the transaction in accordance with the Yavorskaya Closing Instructions.

**Nevada Title's Actions in Closing the Yavorskaya Transaction**

43.     Despite explicit instructions to the contrary, Nevada Title closed the Yavorskaya Transaction even though Nevada Title was aware of excessive real estate commissions being disbursed as part of the transaction; and knew, or should have known, Yavorskaya had not actually paid the required deposit payments.

44.     Nevada Title did not provide the Yavorskaya HUD-1 until after the Yavorskaya Transaction had closed and the Yavorskaya Loan had funded.

45.     According to the Yavorskaya HUD-1 prepared by Nevada Title, Yavorskaya made deposit payments in the total amount of $34,090.

46.     The Yavorskaya HUD-1 also reflected a third party commission payout in the amount of $121,486.50 to Pachinger, as well as another third party payout to Merrill Lynch in the amount of $17,998.

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

47.     Upon information and belief, Yavorskaya did not truly pay the deposit payments; Yavorskaya's deposit payments were paid from a bank account owned by a person named Bryan Campbell, and the funds used to obtain Yavorskaya's deposit payments did not belong to Yavorskaya.

48.     Upon information and belief, the payment to Merrill Lynch in the Yavorskaya Transaction was used to fund a portion of the borrower's deposit payment as well as all or a portion of the borrower's first few mortgage payments.

49.     The Yavorskaya Transaction closed on or around November 14, 2008.

50.     Upon information and belief, Yavorskaya's purchase price for this transaction was not $449,950, as represented to AmTrust; instead, the true purchase price for the Maldive Property was approximately $182,000.   The purchase price was represented to AmTrust as $449,950 in order to induce AmTrust into providing the borrower a larger mortgage loan.

51.     In addition, despite being aware of the excessive commissions payment to Pachinger, Nevada Title never informed AmTrust prior to the closing of the transaction and AmTrust's funding of the Yavorskaya Loan that such excessive commissions payment was to be paid.

52.     Indeed, Nevada Title did not inform AmTrust that Yavorskaya did not pay her required deposit payments, that Pachinger was receiving an excessive commissions payment, or that the true purchase price for the Maldive Property was $182,000 (causing the LTV on the Yavorskaya Transaction to exceed AmTrust's 95 percent cap) prior to the closing of the Yavorskaya Transaction and AmTrust's funding of the Yavorskaya Loan.

53.     Nevada Title's breaches of duty in connection with the Yavorskaya Transaction caused AmTrust to fund a grossly under-secured loan in excess of its LTV requirements, which it otherwise would not have funded had it known the true circumstances surrounding this transaction.

/ / /

/ / /

/ / /

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

*THE MAXWELL LOAN*

> ### The Loan from AmTrust to Maxwell

54.    In or about October, 2008, Carlton Maxwell ("Maxwell") sought a loan from AmTrust to finance the purported purchase of a home from Wagner (the "Maxwell Transaction").

55.    The real property which was the subject of the purported sale from Wagner to Maxwell was located at 8306 Amtrak Express Ave., Las Vegas, Nevada 89131 (the "Amtrak Property").

56.    Under the Maxwell Transaction, Maxwell agreed to purchase the Amtrak Property from Wagner for a purported purchase price of $429,950.

57.    The amount of the loan sought by Maxwell to finance the purchase of the Amtrak Property was $408,452 (the "Maxwell Loan"). AmTrust approved the Maxwell Loan on the condition that Maxwell personally pay at least $21,680 as a deposit payment.

58.    AmTrust further imposed a 95 percent LTV ratio cap on the Maxwell Loan, which meant that the amount of the loan in the transaction could not exceed 95 percent of the purchase price.

> ### The Maxwell Transaction Closing Instructions

59.    In or about September 2008, Nevada Title contracted with AmTrust, agreeing to serve as the closing agent for the Maxwell Transaction and, as such, Nevada Title agreed to abide by AmTrust's Closing Instructions (the "Maxwell Closing Instructions").

60.    The Maxwell Closing Instructions contained the exact same provisions as the Stephenson Closing Instructions quoted herein at paragraphs 17 and 18.

61.    As the closing agent for the Maxwell Transaction and as part of its obligations under the Maxwell Closing Instructions, Nevada Title was also responsible for preparing and submitting an accurate HUD-1 Settlement Statement (the "Maxwell HUD-1") to AmTrust.

62.    Nevada Title accepted the Maxwell Closing Instructions, including all terms and fiduciary duties, by closing the Maxwell Transaction, taking a fee for closing the transaction, and

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

1  specifically certifying that it closed the transaction in accordance with the Maxwell Closing

2  Instructions.

3  ***Nevada Title's Actions in Closing the Maxwell Transaction***

4      63.    Despite explicit instructions to the contrary, Nevada Title closed the Maxwell

5  Transaction even though Nevada Title was aware of excessive real estate commissions being

6  disbursed as part of the transaction; and knew, or should have known, Maxwell had not actually

7  paid the required deposit payments.

8      64.    Nevada Title did not provide the Maxwell HUD-1 until after the Maxwell

9  Transaction had closed and the Maxwell Loan had funded.

10      65.    According to the Maxwell HUD-1 prepared by Nevada Title, Maxwell made

11  deposit payments in the total amount of $22,936.

12      66.    The Maxwell HUD-1 also reflected third party commissions payouts in the

13  amount of $109,637.25 -- $8,599 to Pachinger and $101,038.25 to Realty One -- as well as

14  another third party payout to Merrill Lynch in the amount of $19,347.75.

15      67.    Upon information and belief, Maxwell did not truly pay the deposit payments;

16  Maxwell's deposit payments were paid were paid by I Icon Investment & Financial Solutions

17  and Thomas Santos Meeks, and the funds used to obtain Maxwell's deposit payments did not

18  belong to Maxwell.

19      68.    Upon information and belief, the payment to Merrill Lynch in the Maxwell

20  Transaction was used to fund a portion of the borrower's deposit payment as well as all or a

21  portion of the borrower's first few mortgage payments.

22      69.    The Maxwell Transaction closed on or around October 9, 2008.

23      70.    Upon information and belief, Maxwell's purchase price for this transaction was

24  not $429,950, as represented to AmTrust; instead, the true purchase price for the Amtrak

25  Property was approximately $186,000.    The purchase price was represented to AmTrust as

26  $429,950 in order to induce AmTrust into providing the borrower a larger mortgage loan.

27      71.    In addition, despite being aware of the excessive commissions payments to

28  Pachinger and Realty One, Nevada Title never informed AmTrust prior to the closing of the

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

1  transaction and AmTrust's funding of the Maxwell Loan that such excessive commissions

2  payments were to be paid.

3       72.     Indeed, Nevada Title did not inform AmTrust that Maxwell did not pay his

4  required deposit payments, that Pachinger and Realty One were receiving an excessive

5  commissions payment, or that the true purchase price for the Amtrak Property was $186,000

6  (causing the LTV on the Maxwell Transaction to exceed AmTrust's 95 percent cap) prior to the

7  closing of the Maxwell Transaction and AmTrust's funding of the Maxwell Loan.

8       73.     Nevada Title's breaches of duty in connection with the Maxwell Transaction

9  caused AmTrust to fund a grossly under-secured loan in excess of its LTV requirements, which it

10  otherwise would not have funded had it known the true circumstances surrounding this

11  transaction.

12  ### THE RIOS LOAN

13      **The Loan from AmTrust to Rios**

14       74.     In or about November, 2008, Claudio Rios ("Rios") sought a loan from AmTrust

15  to finance the purported purchase of a home from Wagner (the "Rios Transaction").

16       75.     The real property which was the subject of the purported sale from Wagner to

17  Rios was located at 6749 Lincoln Wood St., Las Vegas, Nevada 89149 (the "Lincoln Property").

18       76.     Under the Rios Transaction, Rios agreed to purchase the Lincoln Property from

19  Wagner for a purported purchase price of $427,000.

20       77.     The amount of the loan sought by Rios to finance the purchase of the Lincoln

21  Property was $405,650 (the "Rios Loan"). AmTrust approved the Rios Loan on the condition

22  that Rios personally pay at least $23,462 as a deposit payment.

23       78.     AmTrust further imposed a 95 percent LTV ratio cap on the Rios Loan, which

24  meant that the amount of the loan in the transaction could not exceed 95 percent of the purchase

25  price.

26  / / /

27  / / /

28  / / /

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

*The Rios Transaction Closing Instructions*

79.     In or about November 2008, Nevada Title contracted with AmTrust, agreeing to serve as the closing agent for the Rios Transaction and, as such, Nevada Title agreed to abide by AmTrust's Closing Instructions (the "Rios Closing Instructions").

80.     The Rios Closing Instructions contained the exact same provisions as the Stephenson Closing Instructions quoted herein at paragraphs 17 and 18.

81.     As the closing agent for the Rios Transaction and as part of its obligations under the Rios Closing Instructions, Nevada Title was also responsible for preparing and submitting an accurate HUD-1 Settlement Statement (the "Rios HUD-1") to AmTrust.

82.     Nevada Title accepted the Rios Closing Instructions, including all terms and fiduciary duties, by closing the Rios Transaction, taking a fee for closing the transaction, and specifically certifying that it closed the transaction in accordance with the Rios Closing Instructions.

*Nevada Title's Actions in Closing the Rios Transaction*

83.     Despite explicit instructions to the contrary, Nevada Title closed the Rios Transaction even though Nevada Title was aware of excessive real estate commissions being disbursed as part of the transaction; and knew, or should have known, Rios had not actually paid the required deposit payments.

84.     Nevada Title did not provide the Rios HUD-1 until after the Rios Transaction had closed and the Rios Loan had funded.

85.     According to the Rios HUD-1 prepared by Nevada Title, Rios made deposit payments in the total amount of $23,940.

86.     The Rios HUD-1 also reflected a third party commissions payout in the amount of $89,670 to Pachinger, as well as another third party payout to Merrill Lynch in the amount of $42,450.

87.     Upon information and belief, Rios did not truly pay the deposit payments; Rios's deposit payments were paid from a bank other than that designated as Rios's banking institution

///

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

1    on Rios's loan application, and the funds used to obtain Rios's deposit payments did not belong

2    to Rios.

3       88.    Upon information and belief, the payment to Merrill Lynch in the Rios

4    Transaction was used to fund a portion of the borrower's deposit payment as well as all or a

5    portion of the borrower's first few mortgage payments.

6       89.    The Rios Transaction closed on or around November 20, 2008.

7       90.    Upon information and belief, Rios's purchase price for this transaction was not

8    $427,000, as represented to AmTrust; instead, the true purchase price for the Lincoln Property

9    was approximately $182,000.  The purchase price was represented to AmTrust as $427,000 in

10   order to induce AmTrust into providing the borrower a larger mortgage loan.

11      91.    In addition, despite being aware of the excessive commissions payment to

12   Pachinger, Nevada Title never informed AmTrust prior to the closing of the transaction and

13   AmTrust's funding of the Rios Loan that such excessive commissions payment was to be paid.

14      92.    Nevada Title did not inform AmTrust that Rios did not pay his required deposit

15   payments, that Pachinger was receiving an excessive commissions payment, or that the true

16   purchase price for the Lincoln Property was $182,000 (causing the LTV on the Rios Transaction

17   to exceed AmTrust's 95 percent cap) prior to the closing of the Rios Transaction and AmTrust's

18   funding of the Rios Loan.

19      93.    Nevada Title's breaches of duty in connection with the Rios Transaction caused

20   AmTrust to fund a grossly under-secured loan in excess of its LTV requirements, which it

21   otherwise would not have funded had it known the true circumstances surrounding this

22   transaction.

23   ***THE BENAMEUR LOAN***

24       ***The Loan from AmTrust to Benameur***

25      94.    In or about June, 2008, Riadh Benameur ("Benameur") sought a loan from

26   AmTrust to finance the purported purchase of a home from Villages at Wine Ridge, LLC (the

27   "Benameur Transaction").

28   / / /

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

95.     The real property which was the subject of the purported sale from Wagner to Benameur was located at 8988 Lily Touchstone Court, Las Vegas, Nevada 89148 (the "Lily Property").

96.     Under the Benameur Transaction, Benameur agreed to purchase the Lily Property from Villages at Wine Ridge, LLC for a purported purchase price of $390,000.

97.     The amount of the loan sought by Benameur to finance the purchase of the Lily Property was $370,500 (the "Benameur Loan").  AmTrust approved the Benameur Loan on the condition that Benameur personally pay at least $18,525 as a deposit payment.

98.     AmTrust further imposed a 95 percent LTV ratio cap on the Benameur Loan, which meant that the amount of the loan in the transaction could not exceed 95 percent of the purchase price.

### The Benameur Transaction Closing Instructions

99.     In or about June 2008, Nevada Title contracted with AmTrust, agreeing to serve as the closing agent for the Benameur Transaction and, as such, Nevada Title agreed to abide by AmTrust's Closing Instructions (the "Benameur Closing Instructions").

100.     The Benameur Closing Instructions contained the exact same provisions as the Stephenson Closing Instructions quoted herein at paragraphs 17 and 18.

101.     As the closing agent for the Benameur Transaction and as part of its obligations under the Benameur Closing Instructions, Nevada Title was also responsible for preparing and submitting an accurate HUD-1 Settlement Statement (the "Benameur HUD-1") to AmTrust.

102.     Nevada Title accepted the Benameur Closing Instructions, including all terms and fiduciary duties, by closing the Benameur Transaction, taking a fee for closing the transaction, and specifically certifying that it closed the transaction in accordance with the Benameur Closing Instructions.

### Nevada Title's Actions in Closing the Benameur Transaction

103.     Despite explicit instructions to the contrary, Nevada Title closed the Benameur Transaction even though Nevada Title was aware of excessive real estate commissions being

/ / /

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

1  disbursed as part of the transaction; and knew, or should have known, Benameur had not actually

2  paid the required deposit payments.

3       104.    Nevada Title did not provide the Benameur HUD-1 until after the Benameur

4  Transaction had closed and the Benameur Loan had funded.

5       105.    According to the Benameur HUD-1 prepared by Nevada Title, Benameur made

6  deposit payments in the total amount of $19,915.

7       106.    The Benameur HUD-1 also reflected third party commissions payouts in the

8  amount of $96,396.88 -- $7,576.88 to Pageantry Realty and $88,820 to Realty One.

9       107.    Upon information and belief, Benameur did not truly pay the deposit payments;

10  instead, a large part, if not all, of Benameur's deposit payments were paid with a cashier's check

11  acquired by Royal Marketing through an account controlled by persons named Joshua

12  Weissbuch and Debra Ann Cunningham, and thus the funds used to obtain Benameur's deposit

13  payments did not belong to Benameur.

14       108.    The Benameur Transaction closed on or around July 1, 2008.

15       109.    Upon information and belief, Benameur's purchase price for this transaction was

16  not $390,000, as represented to AmTrust; instead, the true purchase price for the Lily Property

17  was approximately $174,000.  The purchase price was represented to AmTrust as $390,000 in

18  order to induce AmTrust into providing the borrower a larger mortgage loan.

19       110.    In addition, despite being aware of the excessive commissions payments to

20  Pageantry Realty and Realty One, Nevada Title never informed AmTrust prior to the closing of

21  the transaction and AmTrust's funding of the Benameur Loan that such excessive commissions

22  payments were to be paid.

23       111.    Indeed, Nevada Title did not inform AmTrust that Benameur did not pay his

24  required deposit payments, that Pageantry Realty and Realty One were receiving an excessive

25  commissions payment, or that the true purchase price for the Amtrak Property was $174,000

26  (causing the LTV on the Benameur Transaction to exceed AmTrust's 95 percent cap) prior to the

27  closing of the Benameur Transaction and AmTrust's funding of the Benameur Loan.

28  / / /

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

112.    Nevada Title's breaches of duty in connection with the Benameur Transaction caused AmTrust to fund a grossly under-secured loan in excess of its LTV requirements, which it otherwise would not have funded had it known the true circumstances surrounding this transaction.

**COUNT I**
**BREACH OF CONTRACT**
**(Against Defendant Nevada Title)**

113.    Plaintiff incorporates paragraphs 1 through 112, as if fully set forth herein.

114.    Nevada Title entered into a valid contract with AmTrust (the "Stephenson Closing Agreement") in the form of the Stephenson Closing Instructions and agreed to perform the closing of the Stephenson Transaction in accordance with the Stephenson Closing Instructions.

115.    Nevada Title entered into a valid contract with AmTrust (the "Yavorskaya Closing Agreement") in the form of the Yavorskaya Closing Instructions and agreed to perform the closing of the Yavorskaya Transaction in accordance with the Yavorskaya Closing Instructions.

116.    Nevada Title entered into a valid contract with AmTrust (the "Maxwell Closing Agreement") in the form of the Maxwell Closing Instructions and agreed to perform the closing of the Maxwell Transaction in accordance with the Maxwell Closing Instructions.

117.    Nevada Title entered into a valid contract with AmTrust (the "Rios Closing Agreement") in the form of the Rios Closing Instructions and agreed to perform the closing of the Rios Transaction in accordance with the Rios Closing Instructions.

118.    Nevada Title entered into a valid contract with AmTrust (the "Benameur Closing Agreement") in the form of the Benameur Closing Instructions and agreed to perform the closing of the Benameur Transaction in accordance with the Benameur Closing Instructions.  (The Stephenson Closing Agreement, Yavorskaya Closing Agreement, Maxwell Closing Agreement, Rios Closing Agreement, and Benameur Closing Agreement are collectively referred to herein as the "Closing Agreements".)

/ / /

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

119.   Nevada Title breached the Stephenson Closing Agreement, which was set forth in the Stephenson Closing Instructions by, among other acts, a) not notifying AmTrust that Stephenson did not pay her required deposit payments; b) not notifying AmTrust that Pachinger and Realty One were receiving excessive commissions payments; and c) not notifying AmTrust that the true purchase price for the Barrington Property was substantially lower than $427,000, or that the LTV on the Stephenson Transaction exceeded AmTrust's 95 percent cap.

120.   Nevada Title breached the Yavorskaya Closing Agreement, which was set forth in the Yavorskaya Closing Instructions by, among other acts, a) not notifying AmTrust that Yavorskaya did not pay her required deposit payments; b) not notifying AmTrust that Pachinger was receiving an excessive commissions payment; and c) not notifying AmTrust that the true purchase price for the Maldive Property was substantially lower than $449,500, or that the LTV on the Yavorskaya Transaction exceeded AmTrust's 95 percent cap.

121.   Nevada Title breached the Maxwell Closing Agreement, which was set forth in the Maxwell Closing Instructions by, among other acts, a) not notifying AmTrust that Maxwell did not pay his required deposit payments; b) not notifying AmTrust that Pachinger and Realty One were receiving excessive commissions payments; and c) not notifying AmTrust that the true purchase price for the Amtrak Property was substantially lower than $429,950, or that the LTV on the Maxwell Transaction exceeded AmTrust's 95 percent cap.

122.   Nevada Title breached the Rios Closing Agreement, which was set forth in the Rios Closing Instructions by, among other acts, a) not notifying AmTrust that Rios did not pay his required deposit payments; b) not notifying AmTrust that Pachinger was receiving an excessive commissions payment; and c) not notifying AmTrust that the true purchase price for the Lincoln Property was substantially lower than $427,000, or that the LTV on the Rios Transaction exceeded AmTrust's 95 percent cap.

123.   Nevada Title breached the Benameur Closing Agreement, which was set forth in the Benameur Closing Instructions by, among other acts, a) not notifying AmTrust that Benameur did not pay his required deposit payments; b) not notifying AmTrust that Pageantry Realty and Realty One were receiving excessive commissions payments; and c) not notifying

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

1   AmTrust that the true purchase price for the Lily Property was substantially lower than

2   $390,000, or that the LTV on the Benameur Transaction exceeded AmTrust's 95 percent cap.

3       124.    As a direct and proximate result of Nevada Title's material breaches of the

4   Closing Agreements, Plaintiff has suffered damages, including five severely under-secured

5   mortgage loans from which only a fraction of the loan debt was recovered through the

6   foreclosure of the collateral properties.

7
                            **COUNT II**
8                          **NEGLIGENCE**
                    **(Against Defendant Nevada Title)**
9

10      125.    Plaintiff incorporates paragraphs 1 through 112, as if fully set forth herein.

11      126.    Defendant Nevada Title performed real estate services in connection with the

12   Stephenson Transaction, Yavorskaya Transaction, Maxwell Transaction, Rios Transaction, and

13   Benameur Transaction (collectively the "Closed Transactions").   Defendant Nevada Title was

14   required to perform these services with reasonable care.

15      127.    Defendant Nevada Title's obligations and duties to AmTrust are defined by

16   federal, state and common law, as well as industry standards and the closing instructions for the

17   Closed Transactions by which Nevada Title agreed to abide.  See, e.g., Mark Properties, Inc. v.

18   National Title Co., 117 Nev. 941, 945-946 (2001)) (in addition to their obligations in complying

19   with escrow instructions, escrow agents have a duty to disclose fraud to the parties with whom it

20   has an escrow relationship).

21      128.    Nevada Title breached its duties when it failed to perform services in a manner

22   consistent with its obligations.

23      129.    Nevada Title's negligent performance of its duties caused AmTrust to fund five

24   mortgage loans that it otherwise would not have funded.

25      130.    Neither AmTrust nor the FDIC-R discovered Nevada Title's negligent acts until

26   after AmTrust was closed by the Office of Thrift Supervision on December 4, 2009, nor was it

27   reasonably possible for AmTrust or the FDIC-R to discover Nevada Title's negligent acts prior

28   to such time.

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

131.   As a direct and proximate result of Nevada Title's breach of its professional duties to AmTrust, Plaintiff incurred damages in an amount to be proven at trial.

## COUNT III
### BREACH OF FIDUCIARY DUTY
**(Against Defendant Nevada Title)**

132.   Plaintiff incorporates paragraphs 1 through 112, as if fully set forth herein.

133.   Nevada Title, acting in its capacity as escrow company, assumed and owed a fiduciary duty to advise and/or protect AmTrust in the Closed Transactions by providing its professional services for which it received a fee.

134.   AmTrust relied on a relationship of trust and confidence with Nevada Title in the performance of these professional services, and understood that Nevada Title would act in a fiduciary capacity with regard to its services to lenders such as AmTrust.

135.   Nevada Title knew AmTrust would rely upon the proper performance of Nevada Title's professional services.

136.   Nevada Title breached its fiduciary duty to AmTrust with respect to the Closed Transactions by, among other acts:  (a) allowing each of the borrowers to avoid paying his or her required down payment; (b) failing to disclose to AmTrust the true purchase price in each of the Closed Transactions; (c) failing to notify AmTrust of the excessive commissions paid as part of the Closed Transactions; and (d) failing to notify AmTrust that each of the loans in the Closed Transactions exceeded AmTrust's LTV cap requirements, and allowing the Closed Transactions to close despite the fact that each of the borrowers' loans exceeded AmTrust's 95 percent LTV cap requirement.

137.   As a direct and proximate result of Nevada Title's breach of its fiduciary duties to AmTrust, Plaintiff incurred damages in an amount to be proven at trial.

## COUNT IV
### BREACH OF CONTRACT – THIRD PARTY BENEFICIARY
**(Against Defendant Gonzalez)**

138.   Plaintiff incorporates paragraphs 1 through 112, as if fully set forth herein.

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

139.    The FDIC-R is informed and believes that in October 2008, Gonzalez contracted with Summerlin Mortgage Company ("Summerlin"), the mortgage broker in the Stephenson Transaction, to prepare a Uniform Residential Appraisal Report for the Barrington Property to be used for lending purposes (the "Stephenson Appraisal Agreement").   In entering into the agreement, Gonzalez and Summerlin expressly contemplated that the appraisal of the Barrington Property would be used by Summerlin for the purpose of brokering a loan to mortgage lenders in the secondary mortgage market.

140.    The FDIC-R is informed and believes that on or about October 21, 2008, Gonzalez completed a Land Appraisal Report concerning the Barrington Property (the "Stephenson Appraisal").   The Stephenson Appraisal valued the Barrington Property at $427,000.

141.    The FDIC-R is informed and believes that in October 2008, Gonzalez contracted with Summerlin, the mortgage broker in the Yavorskaya Transaction, to prepare a Uniform Residential Appraisal Report for the Maldive Property to be used for lending purposes (the "Yavorskaya Appraisal Agreement").  In entering into the agreement, Gonzalez and Summerlin expressly contemplated that the appraisal of the Maldive Property would be used by Summerlin for the purpose of brokering a loan to mortgage lenders in the secondary mortgage market.

142.    The FDIC-R is informed and believes that on or about October 9, 2008, Gonzalez completed a Land Appraisal Report concerning the Maldive Property (the "Yavorskaya Appraisal").  The Yavorskaya Appraisal valued the Maldive Property at $450,000.

143.    The FDIC-R is informed and believes that in October 2008, Gonzalez contracted with Summerlin, the mortgage broker in the Maxwell Transaction, to prepare a Uniform Residential Appraisal Report for the Amtrak Property to be used for lending purposes (the "Maxwell Appraisal Agreement").   In entering into the agreement, Gonzalez and Summerlin expressly contemplated that the appraisal of the Amtrak Property would be used by Summerlin for the purpose of brokering a loan to mortgage lenders in the secondary mortgage market.

/ / /

/ / /

144.   The FDIC-R is informed and believes that on or about October 2, 2008, Gonzalez completed a Land Appraisal Report concerning the Amtrak Property (the "Maxwell Appraisal"). The Maxwell Appraisal valued the Amtrak Property at $430,000.

145.   The FDIC-R is informed and believes that in November 2008, Gonzalez contracted with Summerlin, the mortgage broker in the Rios Transaction, to prepare a Uniform Residential Appraisal Report for the Lincoln Property to be used for lending purposes (the "Rios Appraisal Agreement").   In entering into the agreement, Gonzalez and Summerlin expressly contemplated that the appraisal of the Lincoln Property would be used by Summerlin for the purpose of brokering a loan to mortgage lenders in the secondary mortgage market.

146.   The FDIC-R is informed and believes that on or about November 17, 2008, Gonzalez completed a Land Appraisal Report concerning the Lincoln Property (the "Rios Appraisal").   The Rios Appraisal valued the Lincoln Property at $427,000.

147.   The Barrington Property, the Maldive Property, the Amtrak Property, and the Lincoln Property are collectively referred to herein as the "Appraisal Properties".

148.   The Stephenson Appraisal, the Yavorskaya Appraisal, the Maxwell Appraisal, and the Rios Appraisal are collectively referred to herein as the "Appraisals".

149.   The Stephenson Appraisal Agreement, the Yavorskaya Appraisal Agreement, the Maxwell Appraisal Agreement, and the Rios Appraisal Agreement are collectively referred to herein as the "Appraisal Agreements".

150.   In entering into the Appraisal Agreements, Gonzalez knew that the Appraisals would be used by lenders such as AmTrust to evaluate the value of the Appraisal Properties in connection with at least four different mortgage lending transactions.   By the agreements' express terms, lenders such as AmTrust were the intended beneficiaries of the Appraisal Agreements; indeed, Gonzalez expressly certified in each of the Appraisals that "the mortgagee or its successors and assigns, … and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves one or more of these parties."

/ / /

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

151.   The appraiser's certification attached to each of the Appraisals expressly provides, in part, as follows:

2.      I performed a complete visual inspection of the interior and exterior areas of the subject property.  I reported the condition of improvements in factual, specific terms.  I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3.      I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice…

4.      I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value.  I have adequate comparable market data to develop a reliable sales comparison approach for this assignment…

5.      I researched, verified, analyzed and reported on . . . any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, . . . unless otherwise indicated in this report.

6.      I researched, verified, analyzed and reported the prior sales of the comparable sales for the minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in the report.

7.      I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

***

9.      I have reported adjustments to the comparable sales that reflect the market's reaction to the difference between the subject property and the comparable sales.

***

12.     I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area where the property is located.

***

14.     I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value.  I have noted in this appraisal report any adverse conditions…observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal.  I have considered these adverse conditions in my analysis of the property value, and have reported the effect of the conditions on the value and marketability of the subject property.

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

15.   I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this report are true and correct.

\*\*\*

23.   The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves one or more of these parties.

152.   In reliance on the Stephenson Appraisal, AmTrust funded the Stephenson Loan on or about November 3, 2008.

153.   In reliance on the Yavorskaya Appraisal, AmTrust funded the Yavorskaya Loan on or about November 14, 2008.

154.   In reliance on the Maxwell Appraisal, AmTrust funded the Maxwell Loan on or about October 9, 2008.

155.   In reliance on the Rios Appraisal, AmTrust funded the Rios Loan on or about November 20, 2008.

156.   The Stephenson Loan, the Yavorskay Loan, the Maxwell Loan, and the Rios Loan each went into default and the Appraisal Properties were each foreclosed.

157.   Plaintiff thereafter conducted an investigation and discovered that Gonzalez breached the Appraisal Agreements in that each of the Appraisals utilized inappropriate comparable properties in order to arrive at an inflated property value. In particular, each of the comparable properties used in the Appraisals was a builder-sale-property (built by Wagner), and Gonzalez failed to disclose or consider any incentives or contract details in preparing the Appraisals. The comparables relied upon were sold at above-market prices, and were used by Gonzalez to arrive at a value for each of the Appraisal Properties which was greater than true market value.

158.   AmTrust performed and completed all of its obligations owed to Gonzalez as required under the Appraisal Agreements, except as to any acts or obligations AmTrust was excused from performing by Gonzalez's breaches.

///

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

159.    As a direct and proximate result of Gonzalez's material breaches of the Appraisal Agreements, Plaintiff has suffered damages, including four severely under-secured mortgage loans from which only a fraction of the loans was recovered through foreclosure of the Appraisal Properties.

**COUNT V**
**NEGLIGENT MISREPRESENTATION**
**(Against Defendant Gonzalez)**

160.    Plaintiff incorporates paragraphs 1 through 112 and 134-155, as if fully set forth herein.

161.    The FDIC-R is informed and believes and that on or about October 21, 2008, Gonzalez prepared the Stephenson Appraisal, which misrepresented the value of the Barrington Property as $427,000.

162.    The FDIC-R is informed and believes and that on or about October 9, 2008, Gonzalez prepared the Yavorskaya Appraisal, which misrepresented the value of the Maldive Property as $450,000.

163.    The FDIC-R is informed and believes and that on or about October 2, 2008, Gonzalez prepared the Maxwell Appraisal, which misrepresented the value of the Amtrak Property as $430,000.

164.    The FDIC-R is informed and believes and that on or about November 17, 2008, Gonzalez prepared the Rios Appraisal, which misrepresented the value of the Lincoln Property as $427,000.

165.    The appraiser's certification attached to each of the Appraisals represents, among other things, as follows:

> 2.    I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.
>
> 3.    I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice…

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

4.    I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this assignment…

5.    I researched, verified, analyzed and reported on . . . any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, . . . unless otherwise indicated in this report.

6.    I researched, verified, analyzed and reported the prior sales of the comparable sales for the minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in the report.

7.    I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

***

9.    I have reported adjustments to the comparable sales that reflect the market's reaction to the difference between the subject property and the comparable sales.

***

12.    I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area where the property is located.

***

14.    I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions…observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported the effect of the conditions on the value and marketability of the subject property.

15.    I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this report are true and correct.

***

23.    The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves one or more of these parties.

***

25.     Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability…

166.    The Appraisals were submitted to AmTrust for the purpose of facilitating the Stephenson Loan, Yavorskaya Loan, Maxwell Loan, and Rios Loan.

167.    The Appraisals contained numerous material misrepresentations, failures and deficiencies including, but not limited to, misrepresenting compliance with the Uniform Standards of Professional Appraisal Practice; misrepresentations regarding material characteristics of the Appraisal Properties, the comparables, and the market; and misrepresentations regarding the similarities and differences between the comparables and the Appraisal Properties – which resulted in a gross misrepresentation as to the value of the Appraisal Properties.

168.    At the time Gonzalez prepared the Appraisals, he had no reasonable grounds for believing the representations made therein were true and knew or should have known the representations were false.  These representations were material to AmTrust's decision to fund the Stephenson Loan, Yavorskaya Loan, Maxwell Loan, and Rios Loan, and Gonzalez intended for lenders such as AmTrust to rely on the representations made in the Appraisals as part of mortgage lending transactions.

169.    AmTrust reasonably and justifiably relied on the representations made by Gonzalez in the Appraisals in deciding to fund the Stephenson Loan, Yavorskaya Loan, Maxwell Loan, and Rios Loan, each of which was secured by the Appraisal Properties. AmTrust reasonably believed that the information submitted by Gonzalez was true and had been reviewed in accordance with the Uniform Standards of Professional Appraisal Practice and other standards prevalent in the appraisal industry.

170.    As a direct and proximate result of Gonzalez's material misrepresentations, Plaintiff has suffered damages, including a severely under-secured mortgage loan from which only a fraction of the loan was recovered through foreclosure of the Appraisal Properties.

/ / /

/ / /

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

**WHEREFORE**, Plaintiff prays for judgment against defendants Nevada Title Company and Mark A. Gonzalez as follows:

1.      For general, compensatory, and consequential damages, according to proof at trial, plus interest, costs and attorneys' fees;

2.      For its costs of suit incurred herein;

3.      For its reasonable attorneys' fees as allowed by law;

4.      For prejudgment interest at the legal rate allowable; and

5.      For such other and further relief as the court deems just and proper.

DATED this ___3ʳᵈ___ day of December, 2012.

KOLESAR & LEATHAM

By _____
RANDOLPH L. HOWARD, ESQ.
Nevada Bar No. 006688
SHLOMO S. SHERMAN, ESQ.
Nevada Bar No. 009688
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada  89145

Attorneys for Plaintiff
FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER OF
AMTRUST BANK

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

1293157.doc (8408-4)